UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WANDA PALMER, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | 3:14-cv-00953-WWE |
| | : | |
| LIBERTY MUTUAL GROUP INC., | : | |
|     Defendant. | : | |

**MEMORANDUM OF DECISION ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is an action by plaintiff Wanda Palmer alleging that defendant Liberty Mutual Group Inc. discriminated against her and failed to accommodate her in violation of the ADA Amendments Act of 2008 (Counts I and II) and the Connecticut Fair Employment Practices Act ("CFEPA") (Counts III and IV) based upon her disability. Plaintiff further alleges that defendant discriminated against her in violation of the Age Discrimination in Employment Act (Count V) and CFEPA (Count VI) based upon her age. Finally, plaintiff alleges that defendant discriminated against her based upon and interfered with her use of Family Medical Leave Act ("FMLA") leave in violation of that Act (Counts VII and VIII).

Defendant has moved for summary judgment. For the following reasons, defendant's motion will be granted in part and denied in part.

**BACKGROUND**

The following facts are gleaned from the parties' statements of fact, affidavits, deposition transcripts, and other exhibit documentation.

Defendant hired plaintiff as a Claims Specialist III in March 2006. Plaintiff was 38 at the time. For the first four years of her employment, plaintiff worked from home, and defendant provided her a company car. In her role as Claims Specialist, plaintiff determined her own tasks

and schedule, including off-premises field work.

In April 2010, defendant took away plaintiff's car and required plaintiff to work out of defendant's Wallingford, Connecticut, office.

**Plaintiff's Uterine Condition**

In November 2009, plaintiff developed a uterine condition with dysfunctional bleeding, which resulted in her hemorrhaging many times.  Defendant denies having knowledge of plaintiff's condition at the time, but plaintiff disputes that assertion.  Since she worked out of her house at the time, plaintiff was able to accommodate herself and was able to complete all of her work in spite of her condition.

From November 24, 2009, to February 1, 2010, plaintiff took a leave of absence due to anxiety.

In April 2012, plaintiff advised her manager, Peter Bennett, that she would need surgery. Plaintiff underwent a hysterectomy on June 8, 2012.  FMLA leave was approved for the surgery, and plaintiff returned to work on July 23, 2012.  Upon returning to work, plaintiff no longer suffered from uterine bleeding and had no other physical problems other than some temporary abdominal discomfort across the surgical site, which lasted only a couple of months.  Plaintiff required no post-surgery accommodation, but defendant provided flexibility in her schedule for post-surgical medical appointments.

**Plaintiff's Anxiety Disorder**

Plaintiff suffered from what she refers to as "anxiety disorder," which resulted in panic attacks.  In the event of a panic attack occurring at work, plaintiff would simply go to her car and listen to soothing music for a few minutes.

2

**Plaintiff's Work Performance**

In plaintiff's 2007 Objective Setting and Performance Evaluation ("OPSE"), plaintiff's manager, Kristine Biel, rated plaintiff as "Partially Met" or "Did not Meet" in 7 of 15 performance objectives.  Ms. Biel also discussed what she perceived as plaintiff's continuing performance deficiencies:

> Throughout the year, many files were brought to Wanda's attention where claimant follow up was lacking. Improper in-box management throughout the year. Files continued to be overdue or cycled ahead without being worked. Planner and outlook calendar reviews in 2007 show at least two full in days per week, yet files lacked pro-active handling, follow up and pricing to bring claims to resolution. During the second half of the year, I coached and met with Wanda to assist her in these areas and some improvement was noted. Going forward, Wanda's files must reflect timely contact, accurate evaluations and good negotiations.  She needs to improve her time management to ensure she is working her files when they are on her diary.  She also needs to adhere to the financial V3 OFAC guidelines.

Ms. Biel issued a detailed written warning to plaintiff on April 28, 2008, stating that:

Areas of your performance that fail to meet expectations include the following:

•      Perform timely follow up with claimants, policyholders, and witnesses.
•      Perform timely and accurate homeowner liability investigations.
•      Perform timely Evaluations/Negotiations/Settlements.
•      Timely response to Team Manager direction.

In plaintiff's 2008 OSPE, which was prepared by a new manager, Peter Bennett, plaintiff was rated "Partially Met" in 2 of 3 performance objectives.

Again in 2009, plaintiff's OSPE by Mr. Bennett reflected only "Partially Meets" in 2 of 3 performance objectives.  Mr. Bennett noted that, during the second half of 2009, plaintiff was not maintaining adequate "reserves" on all of her cases, and file reviews showed delays in "case price."

Plaintiff's 2010 OSPE by Peter Bennett again reflected only "Partially Meets" in 2 of 3

3

performance objectives.  Mr. Bennett noted in the OPSE that, in April 2010, "file reviews

revealed issues with quality and a lack of proactive filing handling" and that they "implemented

action plans" for most of plaintiff's claims at that time "resulting in improved file handling."

Plaintiff's performance improved in 2011, although her 2011 OSPE by Mr. Bennett once

again reflected plaintiff's propensity towards unsatisfactory performance during one half of the

year, followed by counseling and improvement during the next six months.  Plaintiff testified that

she received a raise and bonus based on her 2011 performance.

Mr. Bennett subsequently gave plaintiff a verbal warning in April 2012 due to her

continued unsatisfactory performance.  Plaintiff asserts that the warning followed her notice to

defendant of her need for a leave of absence to undergo surgery.  Plaintiff also testified that

defendant contemporaneously reduced her authority over her case files.

During a team meeting with plaintiff on May 9, 2012, Mr. Bennett advised plaintiff that

they "were four weeks into the 'verbal' warning regarding her file handling" and that he was not

seeing enough improvement and would continue to monitor her progress.

In a team meeting on May 30, 2012, Mr. Bennett advised plaintiff that her performance

was still unsatisfactory:

> We discussed the last four  weeks of [performance meetings] and I indicated to
> Wanda that I do not see enough improvement and would have recommended moving
> to a Written Warning; however we will wait until she returns in July. I advised her
> that she will need to improve her  claim handling specifically in the areas that we
> have discussed to include proactive litigation file handling, medical report reviews,
> deviating appropriately and lack of file direction.

On June 8, 2012, plaintiff commenced her approved FMLA leave of absence for her

surgery.  Before plaintiff went on leave, Mr. Bennett arranged for her claims files to be monitored

by other claims specialists, with most of the monitoring being conducted by one volunteer, Kris Biel, who continued to handle her own caseload of approximately 160 files.  Defendant removed plaintiff from the new claims files rotation during her absence.

While plaintiff was on leave, Mr. Bennett assumed a non-management Claims Specialist position.  Mr. Bennett's team of Claims Specialists were reassigned to other team managers while a new manager was sought, with plaintiff being assigned to Cynthia Mancini.  Ms. Mancini was aware that plaintiff was on a short-term disability leave but did not know any specifics regarding the leave.

Upon returning to work, plaintiff did not request any accommodations.  She admitted without qualification that there was no part of her job that she could not do as a result of her hysterectomy.

Ms. Mancini had discussed plaintiff's performance with Mr. Bennett and was aware that plaintiff would have been moved to a written warning had she not gone on leave.  Ms. Mancini recommended (and Linda McNeil agreed) that, upon returning from leave, plaintiff would be provided a 30-day period to re-acclimate herself to her files, but plaintiff contends that she continued to be assigned new files during that time and that she spent between two and four of those days away from the office for training.

During the 30-day period following plaintiff's return, Ms. Mancini provided feedback and coaching to plaintiff on several occasions.  Finding that plaintiff's performance was not improving, Ms. Mancini gave her a written warning, which noted that:

> On August 23, 2012, we met to discuss your performance.  Over the past month we have met on several occasions to discuss your performance and objectives. The discussion during these meetings focused on performance objectives and

5

expectations for your role, an assessment of you performance and the need for you to demonstrate significant improvement in specific areas. Since these meetings, you have not demonstrated sufficient progress towards consistently and completely achieving the performance objectives and expectations of your role.

Following the written warning, Ms. Mancini met with plaintiff on a weekly basis to discuss any issues with plaintiff's files. During their meeting on September 21, 2012, Ms. Mancini told plaintiff that her performance had not improved and that probation would be the next step.

On October 5, 2012, Ms. Mancini placed plaintiff on probation due to perceived continued unsatisfactory performance.

On October 15, 2012, Ms. Mancini discussed problems that she had found with plaintiff's handling of several new claim files.

It remains evident post this meeting, Wanda continues to struggle with decision-making, recognizing appropriate claims values and handling files proactively or with any urgency. I advised we would meet again next week.

Ms. Mancini concluded that plaintiff was simply not performing to an effective level and that there had been a consistent lack of proactive file handling.

Plaintiff disagrees with defendant's stated perception of her performance, especially in light of her six-week leave. Plaintiff maintains that her performance rankings were always in the range of effective performance throughout her employment with defendant.

Defendant terminated plaintiff's employment on November 1, 2012, purportedly based upon plaintiff's lack of performance improvement. Plaintiff was 43 years old at the time. Ms. Mancini, plaintiff's immediate manager, was 38 years old at the time, and Ms. Mancini's manager, Linda McNeal, was in her 60s. Ms. Biel, who monitored plaintiff's claim files during

plaintiff's June 2012 FMLA leave, was at least a couple of years older than plaintiff.  Six other Wallingford, Connecticut, Claims Specialists were terminated in 2012. Their ages were 23, 36, 37, 39, 49 and 51.

Plaintiff's direct manager, Ms. Mancini, had taken three separate FMLA leaves.

**Plaintiff's EEOC/CHRO Complaint**

Plaintiff filed her initial discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") and Connecticut Commission on Human Rights and Opportunities ("CHRO") on May 1, 2013.

Only the boxes for "age," "previously opposed discriminatory conduct," "Title VII" and "Age Discrimination in Employment Act," and the CFEPA statute were checked on the cover page of the initial EEOC/CHRO Complaint. The boxes for "mental disability/disorder," "physical disability" and "Americans with Disabilities Act" were *not* selected.

Although the initial EEOC/CHRO Complaint referred to plaintiff's "uterine fibroids" and "work related stress" in connection with plaintiff's FMLA leave from June to July 2012, the Complaint did not allege that either condition was a disability.

On January 7, 2014, approximately 431 days after the termination of her employment, plaintiff filed with the CHRO what she referred to as an "Amended Complaint."

The "Amended Complaint" seeks to add a new claim to the existing EEOC/CHRO complaint, by amending the cover page of the initial complaint to list, for the first time ". . . the protected class bases, mental disease/disorder (anxiety/stress) and physical disability (uterus fibroids with hysterectomy) . . . ." and to allege a violation of the Americans with Disabilities Act, which the plaintiff acknowledged was "not expressly enumerated in the original complaint charge

7

filed with the Commission on May 1, 2013."

Plaintiff asserts that amendment of the complaint was a technical matter affecting only the cover page, as no additional allegations or facts were added to the body of the complaint. Moreover, plaintiff submits that her complaint in its original form included allegations of disability discrimination.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

8

**I. Disability Claims pursuant to the ADAAA and CFEPA (Counts I-IV)**

**A. Statutes of Limitations**

Defendant argues that summary judgment should be granted as to plaintiff's disability claims, as plaintiff's initial EEOC/CHRO complaint was limited to claims of age, color, and FMLA based discrimination.  Plaintiff's amended complaint was not filed until 431 days after the termination of plaintiff's employment – over four months after the 300-day ADA statute of limitations expired and nearly six months after the 180-day CFEPA statute of limitations had run. See Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 575 (7th Cir. 1998) ("[A]n untimely amendment that alleges an entirely new theory of recovery does not relate back to a timely filed original charge.").

> [A] charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b).

"In determining the content of the original complaint for purposes of applying this regulation, we keep in mind that charges are most often drafted by one who is not well versed in the art of legal description.  Accordingly, the scope of the original charge should be liberally construed."  Hicks v. ABT Associates, Inc., 572 F.2d 960, 965 (3d Cir. 1978).

Plaintiff's amended complaint merely added new theories of recovery to the cover page; no changes were made to the factual allegations in the body of the complaint.  Courts have held

that "an amendment, even one that alleges a new theory of recovery, can relate back to the date of the original charge when the facts supporting both the amendment and the original charge are essentially the same."  See Manning v. Chevron Chemical Co., LLC, 332 F.3d 874, 879 (5th Cir. 2003).  In such circumstances, the pertinent question is "whether the employee already included sufficient facts in his original complaint to put the employer on notice that the employee might have additional allegations of discrimination."  Id.

Here, plaintiff contends that "[t]he factual allegations of a disability and violation of the [ADAAA] were alleged in the Complaint filed on May 1, 2013," as evidenced by paragraphs 4, 5, and 6, which provide:

(4) In November 2009, due to excessive work-related stress, I took a medical stress-leave and submitted [] short term disability and Workers Compensation claims of which both claims were denied.  I went without compensation for approximately 2 months and returned to work in February 2010.  Thirty days after returning to work, I was advised to relinquish my company car in March 2010[,] and in July 2010, I was required to work in the office as a claim specialist[.] [T]his meant I lost my company car and the privilege to work from home.

(5) Since November 2009, I began to suffer from uterus fibroids that started at the time I was under severe stress and I informed my team manager in April 2012 that I will need surgery but was unsure when the surgery would be scheduled.  In April 2012, I was placed on verbal warning.  I believe the work-related stress caused and/or contributed to the uterus fibroids.  I later had a hysterectomy on June 8, 2012.  Upon returning, my team manager (Peter Bennett) stepped down (or was demoted) and I was assigned to a new team manager (Cynthia Mancini).  My work had accumulated over the 6 weeks of my leave with little attention.  On August 23, 2012, 1 month after returning from FMLA, I was placed on written warning by my new team manager and claims manager (Cynthia Mancini/Linda McNeil).

(6) On October 5, 2012, I was placed on 30 days probation and terminated on November 2, 2012.  Although I have been employed in the insurance industry for 25 years (since 1987) and have been a licensed insurance adjuster for 20+ years, I was told that I did not know how to perform my job.  After being on written warning, my team manager questioned if I feel I "fit in".  I responded that I was a "decade older" than the other employees but I was fine.  The question had struck me since I had been

employed at Liberty Mutual for over 6 years and was never questioned about fitting in.  I believe the real reason for my termination was due to my age and FMLA retaliation.

Paragraph 6 is not helpful to plaintiff's cause, but, construed liberally, paragraphs 4 and 5 include sufficient facts to put defendant on notice that plaintiff might have had additional allegations of disability discrimination, as both paragraphs discuss defendant's adverse response to plaintiff's ongoing medical impairments.  Accordingly, summary judgment will not be granted based on statute of limitations grounds.

### B. *Prima Facie* Case of Disability Discrimination (Counts I and III)

Defendant argues that plaintiff cannot establish a *prima facie* case of disability discrimination under the ADAAA or CFEPA, in that she has failed to demonstrate that she "suffered an adverse employment action because of her disability."  See Giambattista v. American Airlines, Inc., 584 Fed. Appx. 23, 25 (2d Cir. 2014).

Defendant asserts that, in light of plaintiff's long history of performance problems documented by several different managers, no evidence suggests any discriminatory animus arising out of plaintiff's uterine fibroids or anxiety.  A jury may take that view, but the Court must view the record in the light most favorable to plaintiff.  See U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A study of the record reveals that contrary inferences may be permissible; plaintiff was reprimanded shortly after notifying defendant of her need for leave, and defendant terminated plaintiff and replaced her with someone outside of her protected class within months of her return from leave.  See Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage.").

11

Accordingly, summary judgment will not be granted based on a failure to establish a *prima facie* case of disability discrimination.[1]

## C. Failure to Accommodate (Counts II and IV)

Defendant argues that plaintiff's failure to accommodate claims under the ADAAA and CFEPA should fail because, other than the FMLA leave that was granted, plaintiff did not need or request any type of accommodation for her disabilities.  Indeed, when asked at deposition whether she needed any accommodation relative to any disability, plaintiff responded, "I didn't need any reasonable accommodation."  Pl.'s Dep. at 249.

"A plaintiff states a prima facie failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  McMillan v. City of New York, 711 F.3d 120, 125-26 (2d Cir. 2013).  An employer cannot refuse to make an accommodation that it was never asked to make.  Dooley v. JetBlue Airways Corp., 636 Fed. Appx. 16, 18-19 (2d Cir. 2015).  "An employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be sufficiently direct and specific to give the employer notice of the needed accommodation."  Id.

In response to defendant's arguments regarding failure to accommodate claims, plaintiff cites to Dwyer v. Waterfront Enterprises, Inc., 2013 WL 2947907 (Conn. Super. Ct. May 24,

---

[1]Although defendant does not argue plaintiff's inability to establish pretext regarding her disability discrimination claims, such argument would fail under a similar analysis to that discussed below with respect to plaintiff's FMLA claims.

2013), for the proposition that retaliation for requesting a reasonable accommodation supports a cause of action under Connecticut General Statutes § 46a-60(a)(1).  Dwyer holds that an employer has duty under CFEPA both to provide a disabled employee with a reasonable accommodation and to refrain from retaliating against the employee for seeking the accommodation.  Id. at *11.  Nevertheless, breach of the latter duty establishes the basis for a retaliation claim, which is distinct from a failure to accommodate claim.  Indeed, plaintiff proffers seven federal cases, starting with Blanco v. Brogan, 620 F. Supp. 2d 546 (S.D.N.Y. 2009), in support of the adequacy of her claims, but Blanco, as with the other cases plaintiff cites, examines the contours of retaliation claims.  See Blanco 620 F. Supp. 2d at 554 ("[T]he critical question is whether the plaintiff has presented sufficient evidence from which a reasonable jury could conclude that the defendant intentionally retaliated against the plaintiff for engaging in protected activity."); Palmieri v. City of Hartford, 947 F. Supp. 2d 187 (D. Conn. 2013) (analyzing ADA retaliation claims); Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545 (2d Cir. 2001) (analyzing First Amendment retaliation claims); Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2d Cir. 1980) (analyzing Title VII and Civil Rights Act of 1964 retaliation claims).

Plaintiff's arguments could support retaliation claims, had such claims been alleged, but they cannot save her failure to accommodate claims.  Accordingly, summary judgment will be granted in favor of defendant as to plaintiff's failure to accommodate claims.

## II.  Age Discrimination pursuant to the ADEA and CFEPA (Counts V and VI)

Defendant argues that plaintiff's age discrimination claims should fail, as there is no evidence from which to draw any inference of discrimination based upon plaintiff's age.

Plaintiff's federal and state claims will be analyzed together.  See Weichman v. Chubb & Son, 552 F. Supp. 2d 271, 282 (D. Conn. 2008) ("[T]he Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA.").

Given plaintiff's relatively young age (43), the relative ages of her managers (38 and mid-40s and 60s), and the broad spectrum of ages of similar employees whom defendant terminated in 2012 (23, 36, 37, 39, 49 and 51), the inference that plaintiff's age was a factor in defendant's actions is weak. Moreover, "in the context of summary judgment an ADEA plaintiff who is replaced by a significantly younger worker must offer some evidence of a defendant's knowledge as to the significant age discrepancy to support a prima facie inference of discriminatory intent." Bucalo v. Shelter Island Union Free School Dist., 691 F.3d 119, 130 (2d Cir. 2012).

Here, plaintiff relies upon her own deposition testimony to establish the requisite knowledge of age discrepancy, but plaintiff's unreliable double hearsay is not sufficient:[2]

Q.     How old was the younger replacement?

A.     I don't know exactly how old she was, but I was told that she was a waitress that wear – wore a nose ring.

Pl.'s Dep. at 250.

Plaintiff's only other evidence inferring age discrimination is her recollection that Ms. Mancini "made reference in – in – about me fitting in." Id. at 148.  Plaintiff took this to be

_____

[2]The Court takes no position on the ultimate admissibility of evidence that plaintiff's replacement was a former waitress with a nose ring, either through hearsay exceptions or by introducing statements for reasons apart from their truth.  Nevertheless, such evidence would not demonstrate defendant's knowledge of a significant age discrepancy between plaintiff and her replacement.

referencing her age despite the fact that Ms. Mancini, at 38, is only five years her junior.

Even when resolving all factual ambiguities and drawing all reasonable inferences in favor of plaintiff, no reasonable jury could find by a preponderance of the evidence that age was a motivating factor, let alone the "but-for" cause of defendant's adverse employment actions against plaintiff.  See Gross v. FBL Financial Services, Inc., 557 U.S. 167, 177-178 (2009) (establishing but-for cause for ADEA claims).  Accordingly, summary judgment will be granted in favor of defendant as to plaintiff's age discrimination claims.

### III.  FMLA Discrimination/Retaliation (Count VII)

Defendant argues that plaintiff's FMLA discrimination claims should fail, as plaintiff has failed to demonstrate retaliatory intent.

In the Second Circuit, where a plaintiff alleges that she was punished for exercising her right to take leave under the FMLA, the retaliation analysis pursuant to *McDonnell Douglas* is applicable.  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).  To establish a *prima facie* case of FMLA retaliation, the plaintiff must establish that 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  Graziadio v. Culinary Institute of America, 817 F.3d 415, 429 (2d Cir. 2016).  Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to demonstrate a legitimate basis for its actions.  If so demonstrated, the burden reverts to the plaintiff to show that the defendant's proffered explanation is pretextual.  Id.

Plaintiff has met her *de minimis* burden of making out a *prima facie* case, based in part

upon her testimony concerning acceleration of her negative performance reviews shortly after she notified defendant of her intention to take FMLA leave.  Plaintiff also testified that despite awarding plaintiff with both a raise and a bonus in March 2012, defendant withdrew plaintiff's authority over her own files in April 2012, after learning that plaintiff would be taking time off. See Millea v. Metro-North R. Co., 658 F.3d 154, 164 (2d. Cir. 2011) ("For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights.").

Defendant, in turn, has demonstrated a legitimate basis for its adverse employment action: plaintiff's documented inability to meet performance expectations.

"Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000).  Indeed, credibility analysis becomes central to resolving the contradictory explanations, and the factfinder may infer the ultimate fact of discrimination from a combination of plaintiff's *prima facie* case and the apparent falsity of the employer's explanation. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Here, plaintiff had returned from leave for a little over three months prior to termination of her employment.  The lapse of only several months between the protected activity and adverse

employment action may be sufficient to support an allegation of a causal connection strong enough to survive summary judgment.  See Cioffi v. Averill Park Central School Dist. Board of Ed., 444 F.3d 158, 168 (2d Cir. 2006).  A jury should consider the circumstances surrounding the defendant's decision to demote and terminate plaintiff shortly after she made use of FMLA leave, and shortly after her apparently discordant raise and bonus.  Moreover, direct and cross-examination will provide circumstantial evidence as to whether defendant's explanations are worthy of credence.  Resolving all factual ambiguities and drawing all reasonable inferences in favor of plaintiff, there is a genuine issue for trial as to whether there is a causal connection between plaintiff's protected activity and defendant's adverse employment actions.  Accordingly, summary judgment will be denied as to plaintiff's FMLA retaliation claim.

### IV.  FMLA Interference (Count VIII)

"[T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA."  Graziadio, 817 F.3d at 424.  As plaintiff has not alleged that she was denied FMLA benefits to which she was entitled, summary judgment will be granted in favor of defendant as to plaintiff's FMLA interference claim (Count VIII).

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment [ECF No. 31] is GRANTED in part and DENIED in part.  Summary judgment is GRANTED in favor of defendant as to plaintiff's failure to accommodate claims (Counts II and IV), age discrimination claims (Counts V and VI), and FMLA interference claims (Count VIII).  Summary judgment is DENIED as to plaintiff's disability discrimination claims (Counts I and III), and FMLA discrimination claims (Count VII).

Dated this 9th day of August, 2016, at Bridgeport, Connecticut.


　　　　　　　　　　/s/Warren W. Eginton_____
　　　　　　　　　　WARREN W. EGINTON
　　　　　　　　　　SENIOR UNITED STATES DISTRICT JUDGE